**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| CATHY A. McCALLISTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  09-CV-3337 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Cathy A. McCallister appeals from the denial of her application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively "Disability Benefits") under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(I), 423, 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  McCallister has filed a Brief in Support of Complaint (d/e 11), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 15) and accompanying Memorandum (d/e 16). The parties consented, pursuant to 28 U.S.C. § 636(c), to have this matter proceed before this Court.  Consent to Proceed Before a United States Magistrate Judge, and Order of Reference entered July 8, 2010 (d/e 10).

For the reasons set forth below, the Decision of the Commissioner is affirmed.

STATEMENT OF FACTS

McCallister was born on May 16, 1954.  She completed the eleventh grade.  She obtained a GED high school equivalency certificate in 1981. Answer to Complaint (d/e 8), attached Certified Copy of Transcript of Proceedings before the Social Security Administration (R.), at 30.  She worked as a welder, a packer for a food manufacturer, and a packing machine operator.  She also secured a certification as a nurse's aid, but the certification has since lapsed.  She also has certification as a welder.  R. 30.

McCallister filed her application for Disability Benefits on February 2, 2007.  She alleged that she became disabled on October 13, 2004, when she underwent gastric bypass surgery.  R. 33.  Since then she has suffered from severe abdominal pain, chest pain, fatigue, hypertension, depression, GERD, and insulin-dependent diabetes mellitus.  Her last day of work was June 13, 2005.  R. 31.  She has thereafter received long-term disability payments of $816 twice a month from her last employer.  R. 28  She also has still been covered by her last employer's health insurance.  R. 29.

McCallister is five feet five inches tall.  She weighed approximately 269 pounds at the time of her gastric bypass surgery in 2004.  Her weight

dropped to approximately 100 pounds in the following year.  R. 389-90.

Thereafter, her weight has fluctuated between 110 pounds and 140

pounds.

Dr. Timothi Beth, D.O., has been McCallister's primary care physician

since some time before November 2004.  R. 625.  Dr. Beth has seen

McCallister regularly for her various health problems.  See R. 553-647,

673-690.  In March 2005, McCallister went to Blessing Hospital in Quincy,

Illinois, complaining of poor oral intake, nausea, and vomiting.  R. 199.

Dr. Beth saw McCallister while she was at the hospital.  Dr. Beth referred

McCallister to the University of Missouri Hospital in Columbia, Missouri

(U of M Hospital).  R. 199.

Between September 2005 and June 2006, McCallister was seen by

doctors at U of M Hospital.  R. 313-62.  On September 20, 2005,

McCallister was admitted at the U of M Hospital with persistent nausea,

vomiting, and vitamin/malnutrition.  R. 314-17.  She weighed 126 pounds at

the time.  R. 317.  A gastronomy tube was surgically implanted at that time.

R. 317.  She returned on October 6, 2005, as an outpatient and reported

that she ate well for a few days, but then could take nothing by mouth.

R. 328.  The doctors recommended increasing the amount of liquid

nutrition (referred to as "Boost plus") and to continue her vitamins.  R. 329.

On November 30, 2005, McCallister stopped using the tube to take nutrition, but she was tolerating most foods and her pain was drastically improved with Percocet and Amitriptyline.  R. 334-36.  On March 1, 2006, McCallister was tolerating food much better and her weight had stabilized at approximately 115 pounds.  McCallister reported that she had no more vomiting or nausea at this time.  R. 340.  The feeding tube was removed at this time.  R. 341.  On May 31, 2006, she reported continuing abdominal pain, but the pain was not associated with meals.  R. 343.  She was tolerating food and her weight was up to 123 pounds.  R. 342-43.

McCallister went to the hospital repeatedly for her abdominal pain. She usually went to Blessing Hospital in Quincy, Illinois.  She was hospitalized for one day in March 2005 (R. 198-208); six days in June 2005 (R. 209-22); two days in July 2005 (R. 223-33, 451-55); seven days in August 2005 (R. 234-49); six days in November 2005 (R. 250-62, 479-81); four days in May 2006 (R. 263-73, 482-84); three days in June-July 2006 (R. 274-82); another day in July 2006 (R. 283-91); two days in August 2006 (R. 292-302); three days in September 2006 (R. 303-12); twice for two days each in October 2006 (R. 363-68, 369-86); two days in May 2007 (R. 436-50, 464-65); and seven days in August 2007 (R. 531-52).

On April 21, 2007, McCallister went to see Dr. Raymond Leung, M.D., for a consultative examination.  Dr. Leung noted that McCallister had

diabetes, high blood pressure, and history of gastric bypass surgery and obesity. He also noted McCallister's complaints of abdominal pain. McCallister weighed 126 pounds at the time of the visit. Dr. Leung found that the abdomen was non-tender on examination. The examination was otherwise unremarkable. R. 391.

On April 30, 2007, McCallister went to see agency psychologist Dr. Frank Froman, Ed.D., for a mental status examination. R. 392-95. Dr. Froman diagnosed major depressive disorder, recurrent, secondary to her medical problems. R. 394. He assigned a Global Assessment of Functioning (GAF) of 65, which indicated mild symptoms or limitations at the time of the examination. R. 394. Dr. Froman opined that because of the "cyclic nature of her 'pain syndrome,' it is unlikely that she would be able to maintain steady employment . . . ." R. 394.

On May 7, 2007, psychologist Dr. Phyllis Brister, Ph.D., prepared a psychiatric review and Mental Residual Functional Capacity Assessment of McCallister. R. 409-26. Dr. Brister stated that McCallister suffered from a major depressive disorder, secondary to her medical conditions. R. 412. Dr. Brister opined that McCallister had mild restrictions on activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; moderate limitations in understanding and remembering detailed instructions; and moderate

limitations in carrying out detailed instructions.  R. 419. 423.  Dr. Brister

concluded regarding McCallister:

> 52 year old female assessed under DX Major Depression 2nd
> GMC.  She remains cognitively intact and able to understand,
> recall and execute at least simple operations of a routine,
> repetitive nature.  Social and adaptive skills grossly preserved.
> Capable simple SGA.

R. 425.[1]

On May 9, 2007, Dr. Michael Nenaber, M.D., performed a Residual

Functional Capacity Assessment.  R. 427-34.  Dr. Nenaber opined that

McCallister could occasionally lift and carry twenty pounds, frequently lift

ten pounds, stand and/or walk for a total of six hours in an eight-hour day,

and sit for six hours in an eight-hour day.  He opined that she had no other

limitations on her exertional abilities.  R. 428-34.

On September 17, 2007, Dr. Beth prepared a series of opinions

about McCallister's condition and her capacity to work.  R. 693.[2]  He opined

that McCallister could sit for three hours in an eight-hour day, stand and/or

walk for three hours in an eight-hour day, and she would need an

opportunity to sit or stand at will through the day.  R. 693.  Dr. Beth opined

---

[1]The term "SGA" stands for substantial gainful activity.  See 20 C.F.R. §§ 404.1510 & 404.1572.

[2]Dr. Beth completed three forms in expressing his opinions.  One of the forms is dated June 17, 2007, and two are dated September 17, 2007.  The June date seems to be an error.  McCallister indicates that Dr. Beth rendered all of these opinions on September 17, 2007.  Brief in Support of Complaint (d/e 11), at 9.   The Court, thus, used the September 17, 2007, date in the Opinion.

that McCallister could occasionally lift up to twenty pounds, but could not frequently lift any amount of weight. He opined that McCallister could never balance, and could only occasionally climb, stoop, kneel, crouch, crawl, and reach above her head. R. 694. Dr. Beth opined that McCallister had moderate restrictions on activities involving unprotected heights, running machinery, exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes, and gases. R. 694.

Dr. Beth opined that McCallister suffered from severe pain. He opined that the pain has a reasonable medical basis. He stated that McCallister had recurrent abdominal pain associated with nausea and vomiting. He opined that McCallister's pain would prevent her from working full-time at even a sedentary level. R. 695. Dr. Beth opined that McCallister's pain medication produced side effects that would interfere with her ability to maintain sustained attention and concentration and would preclude McCallister from engaging in skilled work. R. 696.

On December 6, 2007, McCallister saw a pain specialist, Dr. Linh Thuy Nguyen, M.D., for a follow-up visit for chronic pain. Dr. Nguyen noted that McCallister's symptoms were out of proportion to the medical findings. R. 671.

On December 31, 2007, McCallister saw Dr. John M. Bozdech, M.D., for a consultation regarding her abdominal pain. R. 649. Dr. Bozdech described McCallister as "a chronically ill-appearing female." R. 649. He found that the abdomen was soft and non-tender. He found no masses. He ordered further tests on her gastrointestinal system. R. 649-50. The test results were negative. R. 662-65.

On March 7, 2008, McCallister saw Dr. Nguyen again for pain. Dr. Nguyen stated that he talked to McCallister and her daughter-in-law about controlling her pain through means other than going to the emergency room. R. 667. McCallister lived with her son and daughter-in-law. McCallister reported to Dr. Nguyen that if she had a little pain that was not relieved by medication, her daughter-in-law insisted on taking her to the hospital. R. 667. Dr. Nguyen stated that anxiety and psychological factors were driving the pain. He offered McCallister a psychiatric referral, but she declined. Dr. Nguyen stated that the daughter-in-law was too involved in McCallister's care. The daughter-in-law became riled up when McCallister talked about pain and felt that she had to take McCallister to the hospital. Dr. Nguyen added that McCallister was a hypochondriac. R. 669. Dr. Nguyen stated:

> I feel her pain is mainly psychiatric, a lot of anxiety, a lot of not knowing or not allowing herself to use other ways of controlling her pain besides the pain medication. Also, she is a

hypochondriac as well and thinking always there is something
bad going on and it is going to kill her.  Again, we explained this
over and over again that we have done a million dollar workup
and she really has not had anything that we know of that may
be causing the pain, that this is really chronic pain that we need
to deal with, and how her mind and pain goes hand-in-hand.

R. 669.

On February 21, 2008, McCallister was seen by Dr. Max Hammer,

M.D.  Dr. Hammer stated that McCallister had failed to thrive following her

bypass surgery although he could not explain the cause of her symptoms.

He found that she had significant dependence on narcotic pain medication,

emotionally labile, and chronically depressed.  He planned to treat

symptomatically for six months and repeat the examination.  He

recommended weaning off narcotic pain medication.  R. 657-58.

On June 8, 2008, Dr. Beth signed a form in which he opined that

McCallister's condition had not appreciably changed since he expressed

his opinions on September 17, 2007.  R. 692.

The Administrative Law Judge (ALJ) held an evidentiary hearing on

June 17, 2008.  McCallister appeared at the hearing with a non-attorney

representative and Paula Morgan, a former co-worker of McCallister.  R. 9.

Vocational expert Dr. Jeffrey Magrowski also appeared at the hearing.

R. 21.  The ALJ asked whether the case was complete and ready for

hearing.  McCallister's representative agreed that the file was ready and complete.  R. 24.

McCallister testified first at the hearing.  She weighed 117 pounds at the hearing.  R. 26.  The ALJ noted that McCallister weighed 140 pounds at the time she filed her claim.  R. 26.  McCallister stated, "It's just I have so much pain in my stomach I can't eat and my weight fluctuates."  R. 27. She testified that she was divorced and lived in a two-story farmhouse with her son and daughter-in-law.  R. 27.  McCallister testified that she drove when she felt alright.  She estimated that she drove about 20 miles per week.  Her daughter-in-law drove her to the hearing.  R. 28.

McCallister testified that she worked only sporadically after her surgery on October 13, 2004, until she finally stopped working completely on June 13, 2005.  She testified that she tried to go back to work on a more regular basis, but could not.  R. 33.  When asked why she stopped working, McCallister responded, "Because I had a gastric bypass surgery done and which enabled me not to be able to go back to work from being sick and having so much pain."  R. 32.  She said that she could not work because of her pain, exhaustion, and depression.  R. 46-48.

McCallister testified that in a typical day, she woke up, took pain medication, and took a bath until the pain medicine started to work.  She then would watch television.  She would try to do something around the

house if she is not hurting severely or nauseated.  R. 35.  She said that in the afternoon, she would try to get some sleep and deal with the pain. R. 39.  She would try to read the paper or watch television but she had trouble concentrating.  R. 39.  She described her concentration as "splotchy."  R. 48.  Her evenings were similar to her afternoons.  R. 39-40. When she felt up to it, she sat on the porch or did "household stuff."  R. 36.

Her son and daughter-in-law helped her with her finances.  They also took care of McCallister's pet dog.  R. 36.  She would try to cook, but she usually was not able to finish cooking.  She did not wash dishes or do the laundry.  R. 36-37.  She swept, vacuumed and mopped floors when she was feeling well.  R. 37.

McCallister testified that she went to church off and on.  R. 35.  She explained that she did not talk to neighbors or friends, "[b]ecause I don't feel good and I just -- when I'm sick to my stomach and hurting I just don't want to talk to anybody."  R. 36.  She did not belong to any groups or clubs, other than her church.  R. 38.  She talked to her sister on the telephone. R. 37.  McCallister stated that she went grocery shopping when she was able to.  She often started to hurt while shopping and her son or daughter-in-law had to finish the shopping while she sat in the car.  R. 36.  She did not otherwise leave the house for other activities.  R. 40.

McCallister testified that she did not do gardening.  R. 39.  She may

start to mow the grass, but her son would need to finish for her.  R. 39.

McCallister testified that she smoked about a pack of cigarettes a

day, but was trying to quit.  She did not drink or use illegal drugs.  R. 41.

She testified that she took a large amount of prescription drugs for her

medical conditions, including a large amount of prescription pain

medication.  R. 41-45.

McCallister testified that she had problems sitting in a chair at times

due to stomach pain.  She could sit up for ten minutes and then she would

get nauseated.  She testified that she could walk a block or so and then

she would be out of breath.  R. 49.  She could climb a flight of stairs, but

would be out of breath at the top.  R. 49.  She estimated that she could lift

twenty pounds, "but that's pushing it."  R. 49.  She estimated that she could

carry ten pounds short distances.  She had trouble stooping, crouching,

kneeling, and bending because of her stomach pain.  R. 49.

McCallister stated that at the time of the hearing, she had gone to

see Dr. Nguyen for about a year and a half.  She disagreed with Dr.

Nguyen's assessment that she was a hypochondriac.  R. 46.

Upon questioning by her representative, McCallister explained that

she experienced pain, nausea, and dry heaves ten to fifteen minutes after

eating.  She explained that she typically would lay down three to three and

one-half hours a day.  She also testified that she took hot baths up to

fifteen times a day to help deal with the pain.  She stated that she stayed in

the tub from twenty minutes to three hours at a time.  R. 50-52.  She said

that she was not living, but just existing.  R. 53.  She testified that her bad

days were intermittent, but collectively totaled approximately a week out of

every month.  R. 53-54.  She testified that she could not work because of

the pain and her inability to concentrate.  R. 53.

Vocational expert Magrowski then testified.  The ALJ asked

Magrowski the following hypothetical question:

> Please assume a person the age of 54 with a GED education
> and the past relevant work experiences you have identified.
> Please assume I would find this person capable of performing
> the exertional demands of light work as defined in the Social
> Security regulations.  Specifically, a person can, could lift,
> carry, push, pull 20 pounds occasionally, 10 pounds frequently.
> Sit, stand, walk each for six out of eight for a total of eight out of
> eight.  Would need a sit/stand option during the day however.
> Person could occasionally climb, balance, stoop, crouch, kneel,
> or crawl.  Would limit the person to only occasional ladder,
> rope, scaffold.  And the person would be limited to simple,
> repetitive tasks and instructions.  Since I'm limiting her to
> simple, repetitive, I assume there'd be no transferable work
> skills.

R. 58.  Magrowski agreed that the person would have no transferable skills.

Magrowski also opined that the person could not perform McCallister's past

relevant work.  R. 58-59.  Magrowski, however, opined that the person in

the hypothetical question could perform several light, unskilled jobs such as

assembling hospital goods or packing small items such as shoes and bottles.  He opined that 3,000 light hospital assembly jobs existed in the state of Missouri and more than 300,000 in the national economy.  He opined that 2,000 packing jobs existed in the state of Missouri and over 200,000 in the national economy.  R. 59.

On examination by McCallister's representative, Magrowski opined that a person with the limitations set forth in Dr. Beth's September 17, 2007, opinions could not work.  R. 60.  Magrowski also opined that a person who would have unexcused absences from work four to five days per month could not keep a job.  R. 61.  The hearing then concluded.

## THE DECISION OF THE ALJ

The ALJ issued his opinion on July 18, 2008.  R. 9-16.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of the claimant's age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  The listings of such severe impairments are set forth in 20 C.F.R. Part 404 Subpart P,

Appendix 1 (Listing). The claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the claimant not to be able to return to her prior work considering her Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995); Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).

The ALJ determined that McCallister met her burdens at Steps 1 and 2 of the Analysis. She was not engaged in substantial gainful activity and she suffered from severe impairments due to status-post gastric bypass surgery with a secondary major depressive disorder, and insulin-dependent diabetes mellitus and hypertension controlled by medication. R. 15. At

Step 3, the ALJ found that McCallister's condition did not meet a Listing.
R. 11.

At Step 4, the ALJ found that McCallister had the RFC to: (1) lift
and carry ten pounds frequently and twenty pounds occasionally;
(2) occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or
crawl, but not climb ropes, ladders or scaffolds; and (3) perform only
simple, repetitive tasks.  R. 13, 15-16.  The ALJ found that McCallister
could not perform her prior relevant work.  R. 13.

The ALJ rejected Dr. Beth's opinions in making his findings at Step 4.
The ALJ characterized Dr. Beth's opinions as guesswork based on
McCallister's subjective complaints.  The ALJ stated that Dr. Beth's
opinions were not supported by any medical test results.  The ALJ also
cited Dr. Nguyen's opinion that McCallister was a hypochondriac.  R. 13.
The ALJ also relied on Dr. Nguyen's statements that McCallister's pain
symptoms were out of proportion to the medical findings, that her daughter-
in-law was too involved in her care, and that extensive medical testing
revealed no physical explanation for the level of her pain.  R. 12.

The ALJ stated:

It is not that there is absolutely nothing wrong with the claimant.
She did have her gastric bypass surgery in October 2004.
However, no testing since then has shown anything that would
confirm or validate the frequency or severity of the complaints
she alleges. . . .  Her multiple hospitalizations are largely

explained by the claimant's daughter-in-law bringing her to a hospital every time she complains of pain, as noted by Dr. Nguyen.

R. 14.  The ALJ also stated that there was no evidence of non-exertional pain interfering with her ability to concentrate.  The ALJ found that McCallister's depression was controlled by medication.  R. 14.

The ALJ found that McCallister's claim about the level of her pain was not credible.  The ALJ again relied on Dr. Nguyen's opinions to support this finding.  R. 14.

At Step 5, the ALJ determined that the Commissioner met his burden to show that McCallister could perform a significant number of jobs in the national economy.  The ALJ relied on the opinions of Magrowski and the Medical-Vocational Guidelines.  R. 14-15 (citing 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 202.14).  The ALJ concluded that McCallister was not disabled.

McCallister appealed to the Commissioner's Appeals Council.  The Appeals Council denied her request for review on October 30, 2009.  R. 1. McCallister then filed this action for judicial review.

## ANALYSIS

This Court reviews the ALJ's Decision to determine whether it is supported by substantial evidence.  In making this review, the Court considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997

F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ further must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

The ALJ's Decision is supported by substantial evidence.  The ALJ's findings at Steps 3 and 4, including the ALJ's finding of McCallister's RFC, is supported by the opinions of Drs. Brister and Nenaber.  These portions of the ALJ's Decision are also consistent with Dr. Nguyen's statement that McCallister's symptoms were out of proportion to the medical findings.  These portions of the ALJ's Decision are also supported by Dr. Nguyen's statement that a "million dollar workup" did not reveal any medical basis for her pain.  R. 669.  The ALJ's decision at Step 5 is supported by Magrowski's opinion that McCallister could perform a significant number of jobs that exist in the national economy.

McCallister argues that the ALJ erred in not giving Dr. Beth's opinions controlling authority. A treating physician's medical opinion is entitled to controlling weight when it is well supported by medically acceptable clinical and diagnostic techniques and is reasonably consistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. In this case, substantial evidence supports the ALJ's decision to reject Dr. Beth's opinions. Dr. Beth's opinions were inconsistent with the opinions of Dr. Nenaber and Dr. Nguyen. In particular, Dr. Beth opined that there was a medical basis for McCallister's pain, but Dr. Nguyen stated that McCallister's symptoms were out of proportion to the medical evidence. Indeed, Dr. Nguyen stated that a "million dollar workup" did not reveal a medical explanation for her claims of pain. Dr. Nguyen was also a treating physician in this case, and a pain specialist. The ALJ, thus, had reason to give more weight to his opinions as a pain specialist over the opinions of Dr. Beth. Dr. Nguyen's findings provide substantial evidence to support the ALJ's decision to not give Dr. Beth's opinions controlling weight.

McCallister notes that Dr. Nguyen stated that he believed that McCallister's pain had a psychiatric source. Dr. Nguyen, however, did not give a medical opinion that McCallister suffered from a mental impairment that caused her pain, and McCallister does not claim that she suffered from a mental impairment that caused her pain. Furthermore, Dr. Nguyen also

stated that McCallister had a lot of anxiety and did know or not allow herself to use alternate methods to control her pain. Dr. Nguyen also said that McCallister was a hypochondriac. These latter statements by Dr. Nguyen support the ALJ's conclusion that Dr. Beth's opinion was not controlling.[3]

McCallister cites the statement by Dr. Froman that McCallister could not maintain steady employment because of the cyclical nature of her pain. McCallister correctly points out that the ALJ failed to address this statement in his Decision. Any error, however, was harmless. Dr. Froman is a psychologist, and so, is not competent to opine on the physical causes of McCallister's pain or the physical effect of her pain on her ability to work. To the extent that Dr. Froman was discussing McCallister's psychological limitations on her ability to work due to her pain, his opinions were inconsistent with Dr. Brister's opinions. Dr. Brister opined that McCallister could perform simple substantial gainful activity. Neither Dr. Froman nor Dr. Brister treated McCallister; both were retained to render opinions. Given that neither were treating psychologists, and their opinions were conflicting, this Court must find that Dr. Brister's opinions provide substantial evidence to support the ALJ's conclusion that McCallister's

_____

[3]If McCallister wanted to assert that her pain resulted from a mental impairment, she had the burden of proof to present evidence from a psychiatrist or other competent source to support such a finding. She presented no such evidence.

level of pain, from a psychological perspective, would not keep her from working.

McCallister also argues that the ALJ erred in finding that her testimony regarding the debilitating effects of her pain was not credible. The Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record. Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008). The record provides support for the ALJ's determination that McCallister was not credible. In particular, Dr. Nguyen stated that McCallister's symptoms were out of proportion to the medical findings and that he could find no medical cause for her pain. Drs. Nenaber and Brister also opined that she could perform work. This evidence calls into question McCallister's testimony regarding the level of her pain, and so, supports the ALJ's credibility findings. The Court will not disturb those findings.

Finally, McCallister argues that the ALJ erred at Step 5 because Magrowski opined that McCallister was unemployable based on Dr. Beth's opinions. As explained above, substantial evidence supports the ALJ's decision to reject Dr. Beth's opinions. This evidence also supports the ALJ's decision not to consider Magrowski's opinions which relied on Dr. Beth's rejected opinions. There was no error.

THEREFORE, Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 15) is ALLOWED. The Decision of the Commissioner is affirmed. THIS CASE IS CLOSED.

ENTER: February 10, 2011

_____*s/ Byron G. Cudmore*_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE